Choctaw, Incorporated v. Commissioner.
Choctaw, Inc. v. Commissioner
Docket No. 36173.
United States Tax Court
1953 Tax Ct. Memo LEXIS 30; 12 T.C.M. (CCH) 1393; T.C.M. (RIA) 53397; December 9, 1953
W. G. Boone, Esq., 1325 Commerce Title Building, Memphis, Tenn., W. G. Boone, Jr., Esq., and Charles H. Davis, Esq., for the petitioner. Elmer E. Lyon, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in petitioner's income tax for the fiscal years ended October 31, 1948, and October 31, 1949, in the respective amounts of $4,220.28 and $4,006.52. The sole issue presented is whether certain payments made by the petitioner were interest on indebtedness, as claimed by petitioner, or dividends on stock, as determined by respondent. Findings of Fact Many of the facts are stipulated, together with numerous exhibits attached thereto, and all of same are hereby found accordingly and made a part hereof. Those facts hereafter appearing which are not taken from the stipulation are facts found from the record made at the hearing. Petitioner is a Delaware corporation, organized in 1922, with its principal place of business in Memphis, Tennessee, and operates branches in several other cities. Its business is selling and servicing industrial and construction equipment *32 such as road building machinery. Its income is reported on the accrual basis, and its fiscal year ends on October 31st of each year. Its tax returns for the years involved were filed with the collector of internal revenue at Nashville, Tennessee. On January 28, 1947, petitioner's board of directors determined that additional working capital was needed in the operation of the business. Theretofore, when additional funds were required, call bank loans had been obtained. On January 28, 1947, petitioner was indebted on 90-day bank loans to the extent of $100,000, and it was then estimated that such loans would have to be increased to $250,000 before October 1947. Petitioner's business was expanding, requiring larger inventories and accounts receivable, and it also desired to establish other branch agencies. Throughout 1947 petitioner had, without success, sought some type of financing with a longer maturity date than 90 days, since sometimes banks called loans when more and not less credit was necessary. Petitioner had narrowly averted financial disaster when a bank called its loan in the early nineteen thirties, and its predecessor had a similar experience in the early nineteen twenties. *33 Petitioner's officers feared another economic disturbance might follow World War II. Petitioner's business was seasonal, and it would still need short term bank financing to meet seasonal demands, and it desired a long term loan, at a low interest rate under circumstances that would not impair petitioner's bank line of credit. It first sought a loan on a mortgage debt, but Memphis banks advised that a mortgage would interfere with securing future bank loans. In January 1947 petitioner employed Jordan, an investment banker, to assist it in securing a loan at a low interest rate which could be repaid within 20 years, and through his efforts an arrangement was made with Life & Casualty Insurance Company of Tennessee, hereinafter called Insurance Company, whereby petitioner received, on July 30, 1947, the sum of $250,000 from the Insurance Company in return for the issuance by petitioner to the Insurance Company of certain securities dated July 30, 1947, purporting on their face to be 2,500 shares of preferred stock of a par value of $100 per share. Although such securities were issued in the form of preferred stock, negotiations between the parties were conducted on the basis that *34 a loan, not a stock investment, was being made in petitioner. Complying with requirement of Insurance Company, prior to issuance of the preferred stock, petitioner amended its corporate charter. Such amended charter, inter alia, provides: "FOURTH. Section 1. AUTHORIZED CAPITAL STOCK. The total authorized capital stock of this corporation is $325,000.00, divided into 2,500 shares of 4 1/2 percent cumulative preferred stock, hereinafter sometimes called 'preferred stock' or 'preferred shares', of the par value of $100.00 each, or a total par value of $250,000.00 of said preferred stock; and 750 shares of common stock of the par value of $100.00 each, or a total par value of $75,000.00 of said common stock. "Section 2. DIVIDENDS ON PREFERRED STOCK. The holders of said preferred stock shall be entitled to have and receive, as and when declared by the Board of Directors payable out of the surplus or net profits of the company, cumulative dividends at the rate of $4.50 per share per annum payable quarterly on the last days of January, April, July and October, herein sometimes called dividend dates, in each year, before any dividends shall be declared and set apart for, or paid, upon *35 the shares of common stock; provided that the first dividend on the preferred stock at said rate from and after date of issue shall be due and payable on the 31st day of October, 1947. "Section 3. DIVIDENDS TO BE CUMULATIVE. Said dividends on said preferred stock shall be cumulative so that any dividends not paid when due shall be carried forward and added to dividends subsequently becoming due, and shall be paid in full or set apart when and as earned or out of funds otherwise legally available therefor, before any dividends shall be payable on the common stock. "Section 4. NO DIVIDENDS ON COMMON STOCK UNTIL ALL DIVIDENDS ON PREFERRED STOCK ARE PAID OR PROVIDED FOR. No dividends shall be declared or payable to holders of the common stock until all dividends payable to holders of said preferred stock shall have been fully paid, or full payment thereof properly provided for, after which, dividends in the discretion of the Board of Directors, may be declared and paid to the holders of the common stock. "Section 5. RELATING TO REDEMPTION OF PREFERRED STOCK. The company shall redeem said preferred stock in the amounts, at the times specified, and at the redemption values or prices *36 as follows, to-wit: "(a) On the 31st day of October, 1947, such part of 125 shares thereof as shall equal the quotient of the product of 125 multiplied by the number of days between the date of issuance and November 1, 1947, divided by 365. "(b) On the 31st day of October, 1948, 125 shares. "(c) On the 31st of October, 1949, and each year thereafter, 125 shares, and on the 1st day of February next following, such additional number of shares as shall equal the quotient of 20 per centum of the net earnings of the company for its fiscal year ending on said 31st day of October in excess of the sum of $62,500.00, divided by 100. "(d) If at any time there shall be outstanding not more than 125 shares of said stock which the company under any of the foregoing provisions hereof shall not be required to redeem at or prior to said time, then the company shall redeem all of said outstanding shares of said stock on the 31st day of October next following. "The redemption price of said shares of stock under the foregoing provisions shall be the par value of said stock plus dividends due on the redemption date, and all past due and unpaid dividends if any. "Section 8. DISTRIBUTION IN *37 LIQUIDATION. In case of either partial or complete liquidation, dissolution, or winding up, of the company otherwise than by voluntary action, there shall be paid or set apart to the holders of said preferred stock then outstanding the par value thereof plus all accrued dividends at date of payment past due and unpaid, plus a ratable proportion of the dividend becoming due and payable on the dividend date next following date of payment, before any payment or distribution of assets is made or set apart to the holders of the common stock. * * *
"Section 13. COVENANTS OF THE COMPANY. The company covenants with all holders of shares of the preferred stock that, without the approval in writing of the holders of not less than three-fourths of all shares of preferred stock at any time outstanding had and obtained, the company will not transfer or convey by mortgage or pledge, or in any manner create any encumbrance, lien, or charge, upon any of its property or assets which will or might in any manner prejudice, diminish, impair, or impede any of the rights, preferences, priorities, privileges, immunities, or remedies herein given or granted to or vested in the holders of the preferred *38 shares; provided that nothing herein contained shall be construed to prohibit, limit, restrict, or deny to the company to any extent or in any manner the right of the company in the ordinary course of business without said consent to (1) purchase on the usual credit terms goods, wares, merchandise, machinery, equipment, materials, or supplies at not more than the fair value thereof, or (2) give or execute purchase money mortgages or contracts of conditional sale to secure not more than 60 per cent of the fair value or purchase price, whichever is lower, of the property subject thereto, or (3) obtain, renew, or extend usual and customary commercial bank loans for current funds to be used in the ordinary course of business, provided said bank loans shall not be secured by mortgage or pledge of any tangible assets or property of the company. "The company further covenants with all holders of said preferred shares that: "(1) At the times and in the manner elsewhere herein provided, the company will redeem in full not less than the number of shares of preferred stock as provided by Section 5 of this article and particularly as specified in Subsections (a), (b), (c), and (d) of said *39 Section 5; "(2) The company will pay in full all quarterly dividends accruing on the preferred shares promptly on the dates when they shall severally become due and payable; and "(3) At and during any given time the company will have and maintain net working capital in an amount equal to not less than double the par value of the preferred shares then outstanding. "Section 14. EVENTS OF DEFAULT. The following shall constitute events of default as that phrase is used herein, to-wit: "(1) Failure of the company on the 1st day of February in any year to redeem in full any share or shares of preferred stock on said date required to be redeemed as elsewhere herein provided, and the continuance thereof for a period of sixty days thereafter. "(2) Failure of the company on the 31st day of October, 1947, or on any October redemption date thereafter to redeem the full number of shares of preferred stock then required to be redeemed, as provided herein, if (a) the company shall have been in default in redemption of the required number of shares on the preceding October redemption date for as much as sixty (60) days, or if (b) the net profits of the company as determined by Subdivision *40 (a) of Section 12 herein for the fiscal year ending on said redemption date shall have been equal to or in excess of the par value of the shares then required to be redeemed and said failure to redeem shall continue for sixty (60) days, or if (c) the net profits of the company as determined by Subdivision (a) of Section 12 herein for the preceding fiscal year ending on said redemption date shall have been less than the par value of the shares then required to be redeemed and said failure to redeem shall continue for a period of twelve months after said redemption date. "(3) The accumulation of four past due and unpaid quarterly dividends aggregating $4.50 per share of the preferred stock at any time outstanding, or any part thereof. This event of default shall be deemed to continue and not to have been corrected unless and until all dividends then in arrears shall have been paid in full, and not then unless the company shall have fully paid and discharged all other covenants and obligations to the holders of said preferred shares accruing during the continuance of said default. "(4) Failure of the company at any time to have and maintain a net working capital in an amount equal *41 to not less than double the par value of the preferred stock then outstanding and the continuance of said failure for a period of sixty (60) days. "(5) Violation by the company of any other covenant, agreement, or condition by the company herein agreed to be kept and performed, and the continuance of said violation for a period of sixty (60) days. "Section 15. REMEDIES UPON DEFAULT. Upon the happening of one or more events of default as herein defined, upon request in writing of the holders of a majority of the preferred shares then outstanding, the President of the company, or, in case of his absence or inability or refusal to act, the senior Vice-President of the company, if any, or, in case the latter is absent or unable or refuses to act, any other Vice-President of the company, or the Treasurer or the Secretary of the company, shall promptly call a special meeting of all holders of all shares of both the preferred and common stock of the company then outstanding to be held not more than fifteen (15) days after the giving of notice of said meeting, for the purpose of electing a new Board of Directors, who shall hold office from and after their election and qualification until *42 said default or defaults, and all subsequent defaults, if any, shall have been fully corrected. Said new Board of Directors shall consist of such number of members as shall equal one plus two times the number of directors authorized or provided for by the by-laws of the corporation in force at the time of the happening of said events of default. The persons or corporations present or represented by proxy at said meeting owning and holding a majority of the shares of the preferred stock voting separately and as a class shall be entitled to elect by a majority of their ballots a majority of the members of said new Board of Directors; and the persons and corporations present or represented at said meeting owning and holding a majority of the shares of common stock shall be entitled to elect by a majority of their ballots the remaining members of said new Board of Directors. * * *
"Section 17. RIGHTS, ETC. OF HOLDERS OF PREFERRED STOCK MAY NOT BE IMPAIRED. Except by amendment to this certificate of incorporation ratified and approved by the affirmative vote of the holders of not less than three-fourths (3/4) of all shares of the preferred stock then outstanding voting separately *43 as a class, the rights, preferences, priorities, privileges and immunities hereby vested in the holders of the preferred stock shall never be diminished, impaired, or adversely affected in any respect and the company specifically will not: "(a) Increase the authorized number of shares of said preferred stock, or authorize or create any class of stock which shall rank prior to or equal with said preferred shares, or in any way be preferred or equalized either as to dividends or assets over or with the preferred shares hereby authorized; "(b) Alter, amend, or repeal the terms and provisions of this amendment so as to adversely affect the rights, privileges, or preferences of the holders of the preferred shares hereby authorized; or "(c) Authorize any reclassification of the preferred shares hereby authorized or a liquidation, dissolution, or winding up of the company, or a consolidation or a merger of the company or the sale, exchange, lease, or other disposition of all or substantially all of the property of the company. * * *
"Section 19. VOTING RIGHTS. The right to vote for directors of the company and upon all other questions, matters, and things requiring the vote of *44 shareholders, except with respect to the merger or consolidation of the company with another company, or the sale, mortgage, or lease, or other transfer or conveyance of a substantial part of the property and assets of the company, and except as herein otherwise expressly provided, shall be vested in the holders of the common stock exclusively." The Insurance Company on the books credited the payments in question "as cash dividends on stock". At the time of the transaction it would have been difficult to sell to the public preferred stock bearing 4 1/2 per cent interest in a closely held corporation such as petitioner. Furthermore, 4 1/2 per cent interest on bonds was the prevailing rate in Memphis. The Insurance Company was not interested in an investment in stock, and would not have purchased same but for the arrangement with petitioner whereby they expected a return of their money within a maximum period of 20 years and possibly much sooner. Retirement payments made by petitioner in respect of its obligation of $250,000 to the Insurance Company have been as follows: Date of Payment
Amount
October 31, 1947
$ 3,200
November 5, 1948
12,500
October 29, 1949
12,500
January 31, 1950
22,800
October 31, 1950
12,500
January 31, 1951
58,600
October 31, 1951
12,500
January 31, 1952
22,400
October 21, 1952
12,500
January 26, 1953
18,500
Total
$188,000
*45 Petitioner, in its income tax returns for 1948 and 1949, claimed as deductions the respective amounts of $11,106.90 and $10,543.90 as interest paid and which respondent disallowed on the ground that same were dividends on preferred stock. The payments in question were interest paid on indebtedness and were not dividends on stock. Opinion We have carefully considered the evidence as a whole, and based upon the entire record we have found as an ultimate fact that the payments in question were interest payments and not stock dividends. The facts here are strikingly similar to those in United States v. Title Guarantee & Trust Co. (C.A. 6), 133 Fed. (2d) 990, a well considered case, where it was held that interest payments made on corporate certificates designated as preferred stock were, under the facts, interest and not dividends. In reaching this conclusion the court reasoned that in determining the corporation's income tax it must be determined whether the real transaction was that of an investment in, or a loan to, the corporation, and designation of the instrument *46 issued by the corporation is not conclusive; that in ascertaining the parties' real intention regarding the transaction "evidence aliunde the contract" is admissible, and that "one who executes an instrument which does not correctly describe the relation of the parties may, as against the government, disclose the true relationship of debtor and creditor, and sums paid as interest, regardless of the name by which they are called, may be deducted by the taxpayer from its income". Appropriate authorities were cited by the court in support of these holdings. See also John Kelley Co., 1 T.C. 457; Clyde Bacon, 4 T.C. 1107; Bowersock Mills & Power Co. v. Commissioner (C.A. 10), 172 Fed. (2d) 904. The evidence here clearly reveals that the real transaction between petitioner and the Insurance Company was intended between the parties as a loan and not as an investment in stock. This was evident in the preliminary negotiations between petitioner and the Insurance Company and their representatives and also in all subsequent proceedings. The so-called preferred stock was not issued for sale to the public, but for the Insurance Company, and under terms *47 and restrictions prescribed by the Insurance Company, designed to insure repayment of the $250,000 within a definite period, and if default was made in payments as they matured, the Insurance Company could take over petitioner's business. The holder of the preferred stock was a stockholder in name and form, but in substance and in fact was a creditor, having no voice in the operation of the business unless default was made in the payment of the debt due it. The fact that the Insurance Company, by January 26, 1953, within five years from issuance of the stock, had made retirement payments aggregating $188,000 of the $250,000 originally due is further evidence that the transaction was a debt. Decision will be entered for the petitioner.